**In re AMERICAN METROCOMM CORPORATION, et al.,**
**Debtors.**

**American Metrocomm Corporation and Capital Acquisition Corporation,**
**Plaintiffs,**

**v.**

**Duane Morris & Heckscher LLP; Kelley Drye & Warren LLP; Phelps Dunbar LLP; Brian A. Eddington, a Professional Law Corporation; and Breazeale, Sachse & Wilson LLP, Defendants.**

**Bankruptcy Nos. 00–3358 to 00–3369 and 00–3413 to 00–3430.**
**Adversary No. 01–00058.**

United States Bankruptcy Court, D. Delaware.

Jan. 7, 2002.

Neil B. Glassman, Steven M. Yoder, the Bayard Firm, Wilmington, DE, J. Douglas Bacon, Timothy A. Barnes, Peter P. Knight, Lathan & Watkins, Chicago, IL, for Debtors and Debtors–in–Possession.

David B. Stratton, David M. Fournier, Pepper Hamilton LLP, Wilmington, DE, G. Larry Engel, Kent M. Roger, Elizabeth M. Khachigian, Brobeck, Phleger & Harrison LLP, San Francisco, CA, for Capital Acquisition Corporation.

John L. Reed, Thomas P. McGonigle, Timothy R. Dudderar, Duane Morris & Heckscher LLP, Wilmington, DE, John Collen, Howard M. Hoffman, Michael J. Silverman, Duane Morris & Heckscher LLP, Chicago, IL, for Defendants Duane, Morris & Heckscher LLP and Brian A. Eddington.

Robert W. Fenet, Breazeale, Sachse & Wilson LLP, Baton Rouge, LA, for Defendant Breazeale, Sachse & Wilson LLP.

Kent A. Lambert, Phelps Dunbar LLP, New Orleans, LA, for Defendant Phelps Dunbar LLP.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the motion (Doc. # 9) for summary judgment by Plaintiffs American Metrocomm Corporation ("AMC") and Capital Acquisition Corporation ("CAC"). Plaintiffs seek entry of an order pursuant to 11 U.S.C. § 542(e)[1] directing Duane Morris & Heckscher LLP ("Duane Morris"), Kelley Drye & Warren LLP, Phelps Dunbar LLP ("Phelps Dunbar"), Brian A. Eddington, A Professional Law Corporation ("Eddington"), and Breazeale, Sachse & Wilson, LLP ("Breazeale") (collectively, "Defendants") to immediately turn over all files, papers and property related to their legal representation of AMC.[2] I will grant the motion for the reasons discussed below.

## BACKGROUND

AMC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 16, 2000 ("Petition Date"). Prior to the Petition Date, AMC was a holding company for competitive local exchange carriers ("CLECs", collectively with AMC, "Debtor") offering voice and data bundled telecommunication services to business customers in Louisiana and Mississippi.

Prior to the Petition Date, AMC purchased telecommunications equipment from Cisco Systems, Inc. and Worldwide Web Systems, Inc. ("WWSI"), a re-seller of Cisco Systems, Inc.'s equipment and provider of software for the equipment. (Duane Morris' Resp. (Doc. # 25), Ex. A at 1, ¶ 1.) Cisco Systems Capital Corporation (collectively with Cisco Systems Inc., "Cisco") is a pre-petition secured lender that financed the purchase. (*Id.*) CAC is a wholly owned subsidiary of Cisco Systems Capital Corporation. Both CAC and AMC are Plaintiffs in the instant proceeding.

In May 2000, AMC commenced an action against Cisco and WWSI in the Eastern District of Louisiana, alleging that Cisco and WWSI engaged in fraudulent activities related to the sale of certain telecommunications equipment and software to AMC. (*Id.*) Prior to the commencement

---

1. 11 U.S.C. §§ 101 *et seq.* is hereinafter referred to as " § ___".

2. Subsequent to the filing of Plaintiffs' motion, Kelley Drye & Warren LLP agreed to turn over the documents requested by Plain-

tiffs. (Pls.' Reply (Doc. # 28) at 2.) Therefore, the Court will not address the issues raised by Plaintiffs motion with respect to Defendant Kelley Drye & Warren LLP.

of AMC's action in Louisiana, Cisco commenced an action against AMC and WWSI in the Northern District of California, alleging breach of contract in connection with the same transaction (both AMC's and Cisco's actions collectively, "AMC–Cisco Litigation"). (Duane Morris' Resp. (Doc. #25), Ex. D at 1–2.) That action was transferred to the Eastern District of Louisiana in August 2000 on grounds of convenience. (*Id.* at 6.) The action was later dismissed, along with AMC's action against Cisco, pursuant to a joint motion filed by AMC and Cisco on December 6, 2000. (Duane Morris' Resp. (Doc. #25), Ex. B)

Prior to the filing of the joint motion, Cisco had acquired AMC's claims against itself pursuant to an Asset Purchase Agreement ("Agreement") dated November 3, 2000, which was approved by the Court in the Chapter 11 case (*American MetroComm Corporation, et al.* Case Nos. 00–3358 through 00–3369 and 00–3413 through 00–3420(PJW)).

In connection with the Agreement, AMC, Cisco, CAC and joint bidder Madison River Communications LLC also executed an Assignment and Assumption Agreement ("Assignment"), pursuant to which, AMC irrevocably appointed CAC its:

> attorney-in-fact (coupled with the proprietary and other interests of [AMC][t]hereby created) to take such actions and make, sign, execute, acknowledge and deliver all such documents as may from time to time be necessary to assign to [CAC], and its successors and assigns, all rights granted [t]herein.

(Plaintiffs' First Req. for Judicial Notice ("RJN") (Doc. #12), Tab 2 at 2, ¶ 6). (Am. Complaint ¶ 15.)

Pursuant to both the Agreement and the Assignment, AMC assigned its interest in certain litigation claims, referred to in the Agreement as "Assigned Claims," and delegated the management of certain other litigation claims, referred to in the Agreement as "Managed Claims," (collectively, "AMC Litigation Claims") to CAC. (*See id.* at 2, ¶ 3; Am. Complaint ¶ 13.) CAC acquired the AMC Litigation Claims "together with all Shared Privileges and Privileged Materials related thereto" (Agreement at ¶¶ 1.1.8, 1.1.9).

"Shared Privileges" and "Privileged Materials" are defined in the Agreement as:

> all attorney-client, accountant-client, work product, and similar litigation privileges, and all evidence, books, and records subject thereto in which any Debtor or any of its agents has any right, title or interest and which relates to any Assigned Claims, other Property, or Managed Claims, subject to such limitations as are specified in the Agreement.

(Agreement, Ex. G at ¶ (j).) The Agreement also provides:

> [AMC] shall take all actions necessary or appropriate to effectuate the turnover or transfer of the Shared Privileges and Privileged Materials as contemplated under this Agreement, including, but not limited to, seeking relief under any applicable provisions of the Bankruptcy Code; provided, however, that [CAC] shall reimburse [AMC] for fees and expenses incurred to effectuate the turnover or transfer of the Shared Privileges and Privileged Materials. Notwithstanding the [sic] anything to the contrary, [CAC] shall have no obligation (but reserve the option and right) to satisfy any cure costs or liens or claims against the Shared Privileges or Privileged Materials arising prior to the Closing since [CAC] has the right and option to elect not to redeem such product from such liens or claims… Subse-

quent to the Closing, [CAC] shall have the right to manage, waive, enforce or otherwise deal with its respective Shared Privileges and Privileged Materials with respect to Managed Claims as if it were (at its option) any or all of: (i) the representative under 11 U.S.C. § 1123(b)(3)(B) enforcing such Managed Claims... [CAC] shall resolve at [its] expense any lawyers claims to liens on files relating to the Assigned Claims and Managed Claims.

(Agreement at ¶ 1.5.)

Defendants are law firms that provided pre-petition legal services to AMC in connection with the AMC–Cisco Litigation. (Am. Complaint ¶ 16.) Defendants Breazeale, Phelps Dunbar and Duane Morris have filed proofs of claim in Debtor's bankruptcy for unpaid legal services.[3]

By letters dated November 30, 2000, AMC notified Defendants that it had transferred its interest in the AMC Litigation Claims to Cisco and requested that Defendants turn over all files, papers and property related to the representation of AMC ("Attorney Files") to Cisco or its designee, CAC. (*Id.* at ¶ 21, Ex. A through F attached thereto.) Defendants failed to do so. (*Id.* at ¶ 23; Aff. of Charles W. Stewart (Doc. # 11) ¶¶ 3–9.) They assert that they have statutory and/or common law liens on the Attorney Files due to

AMC's failure to fully pay for their services.

In response to Defendants' failure to turn over the Attorney Files, Plaintiffs commenced this adversary proceeding against Defendants seeking (1) to compel turnover of the Attorney Files pursuant to § 542(e)[4] (Am. Complaint ¶¶ 24–31), and (2) injunctive relief pending a resolution on the merits (*id.* at ¶¶ 32–37), and Plaintiffs' now ask for summary judgment with respect thereto.

## DISCUSSION

### I. Standard for Summary Judgment

Defendants respond to Plaintiffs' motion for summary judgment by arguing that turnover is improper under § 542(e) (Duane Morris' Resp. (Doc # 25) at 6–11)[5], and that they have valid, perfected and enforceable liens on the Attorney Files which must be satisfied prior to turnover. (*Id.* at 11–19; Breazeale Mem. (Doc # 23); Phelps Dunbar Mem. (Doc # 24) at 2.)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[6] The moving party

---

3. Breazeale has filed proof of an unsecured claim in Debtor's bankruptcy. (RJN (Doc. # 12), Tab 6.) Phelps Dunbar and Duane Morris have filed proofs of secured claims. (*Id.* at Tabs 5, 12.) Eddington has not filed a proof of claim.

4. Section 542(e) provides:

Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial

affairs, to turn over or disclose such recorded information to the trustee.

5. The arguments included in Duane Morris' Resp. (Doc. # 25) have been incorporated by reference into the memoranda of Defendants Breazeale and Phelps Dunbar. Therefore, the arguments contained therein are deemed to be made by all Defendants except Kelley Drye and Warren LLP.

6. Federal Rule of Civil Procedure 56(c) is applicable to contested matters in bankruptcy pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7056.

bears the initial responsibility of proving that no genuine issue of material fact is in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden of demonstrating that no genuine issue of material fact exists, the party opposing summary judgment must advance more than conclusory statements and allegations. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362–63 (3d Cir.1992). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), *quoting* Fed.R.Civ.P. 56(e). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The Court must accept as true the evidence of the non-moving party where it contradicts that of the moving party. *Big Apple*, 974 F.2d at 1363.

I find that Plaintiffs have met their burden of demonstrating that no genuine issues of material fact are in dispute. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Although Defendants claim that genuine issues of material fact exist, they do not set forth specific facts demonstrating that there is a genuine issue for trial. *See First Nat'l*, 391 U.S. at 288, 88 S.Ct. 1575. Rather than dispute the facts presented by Plaintiffs, Defendants set forth additional *undisputed* facts and unsupported legal conclusions. (Duane Morris'

Resp. (Doc. # 25) at 3–5.) None of the evidence presented by Defendants contradicts that presented by Plaintiffs. *See Big Apple*, 974 F.2d at 1363. Rather, Defendants rely on the same set of facts to arrive at different legal conclusions.

There is no genuine dispute that the AMC Litigation Claims, to which the Attorney Files relate, have been transferred to CAC pursuant to the terms of the Agreement. Defendants' submission that CAC agreed, under the terms of the Agreement, to pay to resolve all attorneys' liens on the Attorney Files (Duane Morris' Resp. (Doc. # 25) at 5) does not constitute a disputed fact that precludes summary judgment. CAC's obligations under the terms of the Agreement are a matter of contract interpretation to be decided by the Court. Similarly, Defendants' submission that the AMC Litigation Claims "can no longer affect [Debtor's] Estate" as a result of the transfer (*id.*) is a matter of law for the Court to decide, not a question of fact. Furthermore, whether Defendants have valid and enforceable liens on the Attorney Files is an issue that is to be decided under applicable state law.

Resolution of the parties' dispute turns solely on a determination of: (1) whether CAC is obligated to satisfy any attorneys' liens on the Attorney Files under the terms of the Agreement, (2) whether turnover of the Attorney Files is proper under § 542(e), and (3) whether Defendants have valid, perfected and enforceable liens on the Attorneys Files. These constitute legal issues that do not depend, in any way, on the resolution of a factual dispute. Therefore, summary judgment is proper.[7]

---

**7.** In addition, Breazeale's argument that summary judgment should be denied because five law firms agree that turnover is not warranted and because this Court's decision may become controlling case law is not compelling (Doc. # 23 at 9–10). The importance of the

legal issues involved and the number of firms declining to produce the Attorney Files do not in and of themselves warrant a full hearing on the merits. Summary judgment is proper whenever there are no genuine issues of material fact and the moving party is entitled to

## II. CAC's Obligations to Satisfy Liens on the Attorney Files Under the Agreement

█ In their efforts to defeat summary judgment, Defendants first point out that CAC agreed to pay to resolve all attorneys' liens on the Attorney Files pursuant to Paragraph 1.5 of the Agreement. (Duane Morris' Resp. (Doc. # 25) at 5.) Paragraph 1.5 of the Agreement states, "[CAC] shall resolve at [its] expense any lawyers claims to liens on files relating to the Assigned Claims and Managed Claims." (Agreement at ¶ 1.5.) Defendants argue that this language conclusively demonstrates that CAC has no right to the Attorney Files unless it pays for them. Plaintiffs argue that this provision only requires CAC to pay for the resolution of Defendants' *claims* to liens, not for the liens themselves.

I agree with Plaintiffs' interpretation of paragraph 1.5 and find that CAC is obligated to pay for the resolution of attorneys' claims to liens, but is under no obligation to pay for the alleged liens. Not only does the language cited by the parties clearly and unambiguously refer to "claims to liens", but paragraph 1.5 also provides:

> Notwithstanding the [sic] anything to the contrary, [CAC] shall have no obligation (but reserve the option and right) to satisfy any cure costs or liens or claims against the Shared Privileges or Privileged Materials arising prior to the Closing since [CAC] has the right and

option to elect not to redeem such product from such liens or claims.

(Agreement at ¶ 1.5.) Clearly this language provides CAC with the "option and right" to pay off any pre-petition liens attaching to the Attorney Files, but no obligation to do so. Therefore, I find that if Defendants are found to have valid liens on the Attorney Files under applicable state law, CAC may choose to satisfy Defendants' liens if it wishes to obtain possession of the Attorney Files. Otherwise, CAC is under no obligation to so.

## III. Turnover

Defendants next respond to Plaintiffs' motion by setting forth four arguments as to why turnover is improper under § 542. I will address each of these arguments separately.

### A. CAC's Ability to Pursue Turnover as Representative of the Estate

Defendants argue that turnover is improper under § 542 because CAC's authority as representative of the estate under § 1123(b)(3)(B) [8] does not extend to a turnover action for assets in which the debtor's estate's ("Estate's") interest has been sold. (Duane Morris' Resp. (Doc. # 25) at 6–7.) In support of their argument, Defendants rely on *In re Allegheny Health, Edu. and Research Found.*, 233 B.R. 671 (Bankr. W.D.Pa.1999). In *Allegheny*, non-debtor plaintiffs brought an action against third parties under § 542(a) for turnover of as-

---

judgment as a matter of law. Fed.R.Civ.P. 56(c).

8. Section 1123(b)(3)(B) provides:
 (b) Subject to subsection (a) of this section, a plan may-
 \* \* \* \* \* \*
 (3) provide for-
 \* \* \* \* \* \*
 (B) the retention and enforcement by the debtor, by the trustee or by a representa-

tive of the estate appointed for such purpose, of any such claim or interest;

sets allegedly purchased from a chapter 11 debtor. 233 B.R. at 674–75. The court dismissed the first count of plaintiffs' complaint, premised on § 542(a), for failure to state a claim upon which relief could be granted, finding that plaintiffs could not have obtained the debtor's estate's cause of action under § 542(a) because:

> (a) such cause of action... may not be assigned unless, consistent with 11 U.S.C. s. 1123(b)(3)(B), such an assignment is to a representative of a bankruptcy estate for the sole purpose of pursuing said cause of action (cites omitted), and (b) plaintiffs cannot appropriately be considered to be a representative of the instant debtors' bankruptcy estate since plaintiffs' pursuit of any cause of action would be on their own behalf rather than for the benefit of said bankruptcy estate.

*Id.* at 676. The court also rested its decision, in part, on the facts that (1) the parties expressly agreed not to include the § 542(a) turnover action against the defendants in the asset purchase agreement, and (2) the plaintiffs did not request proper relief in the complaint because they sought turnover to themselves rather than to the estate's trustee. *Id.*

*Allegheny* is inapposite to the instant proceeding for several reasons. First, Plaintiffs seek turnover under § 542(e), not under § 542(a). Second, AMC has expressly assigned to CAC the right to deal with the Shared Privileges and Privileged Materials related to the Managed Claims as if CAC were the Estate's representative under § 1123(b)(3)(B) enforcing such claims. (Agreement at ¶ 1.5.) In addition, where the plaintiffs in *Allegheny* sought turnover to themselves as non-debtor third-parties, AMC seeks turnover as debtor-in-possession. Finally, I disagree with Defendants' contention that turnover will not benefit the Estate be-

cause the Estate's interest in the Attorney Files has been sold.

■ Section 542(e) provides that subject to any applicable privilege, the court may order an accountant or attorney to turn over or disclose recorded information relating to "debtor's property or financial affairs... *to the trustee.*" 11 U.S.C. § 542(e) (emphasis added). Section 1107 provides that "a debtor in possession shall have all the rights... and powers... of a trustee serving in a case under this chapter." 11. U.S.C. § 1107. Therefore, regardless of CAC's entitlement to pursue turnover as the Estate's representative under the terms of the Agreement, AMC is entitled to seek turnover of the Attorney Files as debtor-in-possession. The addition of CAC as a plaintiff does not alter the fact that AMC may seek turnover on its own behalf.

Furthermore, there is no basis for Defendants' argument that turnover will only benefit CAC. The Estate has already received benefit from the transfer of AMC's assets to CAC by reason of the consideration it received in exchange for the transfer. In addition, AMC remains obligated to "take all actions necessary or appropriate to effectuate the turnover or transfer of the Shared Privileges and Privileged Materials" to CAC under the terms of the Agreement. (Agreement at ¶ 1.5.) Any failure on AMC's part to do so may constitute a breach of contract and give rise to related claims against AMC. A resolution of any such claim in favor of CAC could deplete the Estate and reduce the recovery available to Debtor's creditors. To the extent that turnover results in enabling AMC to fulfill its contract obligations to CAC, I find that the Estate will benefit from turnover.

Furthermore, I disagree with Defendants's argument that Plaintiffs' have failed to demonstrate how CAC's prosecu-

tion of the AMC Litigation Claims would benefit the Estate. Pursuant to the terms of the Agreement, AMC is entitled to receive portions of increased recoveries of certain Managed Claims. (Agreement at ¶ 2.1.2.) Although Defendants argue that CAC has no incentive to pursue such claims, the Managed Claims include more than just the claims filed against Cisco in the AMC–Cisco Litigation. Defendants acknowledge that AMC's claims against WWSI remain pending. (Duane Morris' Resp. (Doc. # 25 at 5.)) Given the fact that Cisco filed claims against WWSI independent of those filed by AMC, I find no basis upon which to conclude that CAC would not pursue any of the Managed Claims. Therefore, I find that, to the extent AMC is entitled to receive portions of recoveries from such Managed Claims, the Estate would certainly benefit from turnover of the Attorney Files.

## B. The Attorney Files As Property of the Estate

■ Defendants next argue that turnover under § 542 only applies to property of the estate and the Attorney Files do not constitute property of the estate owing to their sale to CAC. (Duane Morris' Resp. (Doc. # 25) at 7–8.) I disagree. "The Bankruptcy Code creates a 'two-part scheme for turnover of property of the estate and other information related to the debtor's property or financial affairs.' " *In re Foster*, 188 F.3d 1259, 1265 (10th Cir. 1999), *quoting Keller v. Blinder (In re Blinder, Robinson & Co.)*, 140 B.R. 790, 792 (D.Colo.1992). Section 542(a) requires anyone holding property of the estate to deliver it to the trustee. 11 U.S.C. § 542(a); *Foster*, 188 F.3d at 1265. Section 542(e) allows the Court to order "an attorney, accountant or other person that holds recorded information... relating to the debtor's property or financial affairs" to turn over such information to the trust-

ee. 11 U.S.C. § 542(e). Although an action for turnover under § 542(a) requires that the information requested be property of the estate, there is no such requirement in § 542(e). Therefore, whether the Attorney Files constitute property of the estate is irrelevant to the Court's determination of whether turnover is proper under § 542(e).

## C. Propriety of Turnover Under § 542(e)

■ Defendants also argue that the Court should not apply § 542(e) in the instant proceeding because turnover would be inconsistent with the statute's intended purpose. (Duane Morris' Resp. (Doc. # 25) at 8–10.) The legislative history of § 542(e) suggests that the provision was intended to deprive attorneys of the leverage acquired under state lien laws to receive full payment of professional fees over the debts of other creditors when the information withheld is necessary to the administration of the estate. H.R. 95–595, 95th Cong., 1st Sess. 369–70 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963; S.Rep. No. 95–989, 95th Cong., 2d Sess. 84 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *see, e.g., In re Highland Park Assoc. Ltd. P'ship.*, 132 B.R. 358, 358 (Bankr.N.D.Ill.1991), *quoting In re Norsom Med. Ref. Lab., Inc.*, 10 B.R. 165, 168 (Bankr.N.D.Ill.1981); *In re Matassini*, 90 B.R. 508, 509 (Bankr.M.D.Fla. 1988).

■ Defendants' argue that turnover would be inconsistent with the intended purpose of § 542(e) because Defendants will not be paid "ahead" of other creditors and because the Attorney Files are not necessary to the administration of the Estate. However, I find that the instant adversary proceeding is the kind the situa-

tion which § 542(e) was enacted to prevent.

Defendants argue that they will not be paid "ahead" of other creditors because their fees will not be paid out of the Estate. However, any payment to Defendants for the Attorney Files, regardless of its source, would violate bankruptcy policy by placing Defendants in a better position than those other creditor of the Debtor who will not receive full payment of the debts owed to them. In addition, although I am not persuaded by Defendants' argument that a court may only order turnover upon finding that the information requested is "necessary to the administration of the estate,"[9] I have already discussed how turnover of the Attorney Files benefits the Estate. *See* discussion *supra* Part III, A. Such benefits clearly serve the interests of the administration of the Estate.

### D. The Attorney–Client and Work Product Privileges

Finally, Defendants argue that turnover is precluded by the language in § 542(e) which provides that the Court may order turnover "subject to any applicable privilege." 11 U.S.C. § 542(e). Defendants argue that this language precludes turnover in the instant proceeding because the Attorney Files are subject to the attorney-client privilege which AMC has refused to waive. (Duane Morris' Resp. (Doc. # 25 at 10–11.)) Defendants also argue that turnover is precluded by the work product privilege because such privilege is held by attorneys as well as their clients and therefore, cannot be waived without Defendants' consent. (*Id.*) I find that Defendants are incorrect on both counts and hold that neither privilege bars turnover of the Attorney Files under § 542(e).

Federal Rule of Evidence 501 provides that, except where state law provides the governing rule in civil proceedings, control of a debtor's privileges is governed by federal common law. Fed. R.Evid. 501. In the instant proceeding, the issue of whether or not turnover is proper under § 542(e) is governed by federal bankruptcy law. Therefore, federal common law governs control of Debtor's privileges. *See id.; Foster*, 188 F.3d at 1264; *In re Bame*, 251 B.R. 367, 372 (Bankr.D.Minn.2000).

### 1. The Attorney–Client Privilege

Defendants argue that AMC's failure to waive the attorney-client privilege precludes turnover. The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby

---

9. Defendants' overreach by stating that the "vast majority" of cases require that the documents requested be necessary to the administration of the debtor's estate. (Duane Morris' Resp. (Doc. # 25) at 9–10.) With the exception of *In re Matassini*, 90 B.R. 508 (Bankr. M.D.Fla.1988), none of the cases actually find that the documents must be necessary to the administration of the estate before ordering turnover. *See In re O.P.M. Leasing Serv., Inc.*, 13 B.R. 64, 69–70 (S.D.N.Y.1981) (citing legislative history of § 542(e) but addressing the issue of whether the debtor's attorney-client privilege passes to its trustee); *Direnfeld, Greene & Blackburn Co. v. Olmsted Utility, Inc. (In re Olmsted Utility, Inc.)*, 127 B.R. 808, 813 (Bankr.N.D.Ohio 1991) ("[i]t is unclear to the Court at this point whether the litigation... has or will result in any benefit to the Debtor or its estate."); *In re Jarax Int'l, Inc.*, 81 B.R. 715, 718 (Bankr.S.D.Fla.1987) (ordering law firm to permit Trustee to inspect and copy any records relating to the affairs of the debtor and stating, "[t]he current posture of this case makes a determination by the Trustee and this Court of the importance of the records held... to the administration of the estate impossible..."); *In re Sea Catch, Inc.*, 36 B.R. 226, 232 (Bankr.D.Alaska 1983) (citing legislative history of § 542(e), but finding § 542(e) inapplicable).

promote broader public interests in the observance of law and administration of justice." *Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege was intended for the ultimate benefit of the client and to protect the client against disclosures constituting a breach of the client's trust. *Donovan v. Fitzsimmons,* 90 F.R.D. 583, 587–88 (N.D.Ill.1981). The party claiming the privilege has the burden of establishing its applicability, which is narrowly construed. *Foster,* 188 F.3d at 1264.

Outside of bankruptcy, the client is the sole holder of the attorney-client privilege. *In re Bame,* 251 B.R. at 372. However, in *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), the United States Supreme Court held that the trustee of a corporation in bankruptcy also has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications. *Id.* at 358, 105 S.Ct. 1986. In making its decision, the Court reasoned that "[b]ecause the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy". *Id.* at 351–52, 105 S.Ct. 1986; *see also Bame,* 251 B.R. at 373 ("While the corporation remains in possession, its management controls the attorney-client privilege.")

In this Chapter 11 case, AMC is a debtor-in-possession. Therefore,

AMC controls the attorney-client privilege with respect to both its pre— and post-petition communications with Defendants. *See Weintraub,* 471 U.S. at 358, 105 S.Ct. 1986; *Bame* 251 B.R. at 370, 375 (holding, upon conversion of individual debtor's chapter 11 case to chapter 7, that the attorney-client privilege passed to trustee with respect to all communications of debtor during the period he served as debtor-in-possession as to all matters having to do with the administration of the estate); *see also O.P.M. Leasing,* 13 B.R. at 67 ("It is equally clear that a debtor in bankruptcy is entitled to the benefit of the attorney-client privilege.")

As a result, I am not persuaded by Defendants argument that turnover of the Attorney Files to CAC is precluded by AMC's failure to waive the attorney-client privilege. As discussed above, in addition to CAC's request for turnover, AMC requests turnover on its own behalf. Therefore, by arguing that turnover is improper without a waiver of the attorney-client privilege, Defendants effectively attempt to assert the privilege against their own client, the privilege-holder. However, because AMC remains the sole holder of the attorney-client privilege in bankruptcy, Defendants have no ability to assert the privilege unless acting with AMC's authority to do so.[10] Therefore, I find turnover is not precluded by AMC's purported failure to waive the attorney-client privilege.

### 2. The Work Product Privilege

Defendants also argue that turnover is precluded by the work product privilege which partly belongs to Defen-

---

**10.** Furthermore, as AMC's "attorney-in-fact" under the Assignment (RJN (Doc. # 12), Tab 2 at 2, ¶ 6), and having received the "right to manage, waive, enforce or otherwise deal with its respective Shared Privileges and Privileged Materials with respect to Managed Claims as if it were (at its option) any or all of: (i) the representative under 11 U.S.C. § 1123(b)(3)(B) enforcing such Managed Claims" under the Agreement (Agreement at ¶ 1.5), CAC shares AMC's privileges equally with AMC. Therefore, Defendants cannot invoke the attorney-client privilege against either Plaintiff.

dants and therefore, cannot be waived without their consent. (Duane Morris' Resp. (Doc. # 25) at 11.) Unlike the attorney-client privilege, the work product privilege is intended to protect against the disclosure of mental impressions, conclusions and opinions of an attorney. *See Donovan*, 90 F.R.D. at 588. The work product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that "a party may not obtain discovery of documents or other tangible things prepared in anticipation of litigation or trial." FED.R.CIV.P. 26(b)(3). The privilege promotes the adversarial system by protecting the confidential nature of materials prepared by attorneys in anticipation of litigation, enabling attorneys to prepare cases without fear that their work product will be used against their clients. *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).

Defendants cite *Donovan v. Fitzsimmons*, 90 F.R.D. 583 (N.D.Ill.1981) and *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408 (D.Del.1992) in support of their argument that the work-product privilege belongs in part, if not solely to Defendants. However, neither *Donovan*, nor *Remington Arms Co.* addresses the situation in which an attorney attempts to assert the work-product privilege against his own client. *See Donovan*, 90 F.R.D. at 584 (Secretary of Labor sought production of certain records of the Central States, Southeast and Southwest Areas Pension Fund in connection with underlying ERISA action); *Remington Arms Co.*, 142 F.R.D. at 410 (Insurer with contractual obligation to defend and indemnify insured under various excess liability insurance policies moved to compel documents related to underlying claims against insured for environmental damage).

Other courts dealing with that specific situation have recognized that the work product doctrine "does not apply to the situation in which a client seeks access to documents or other tangible things created or amassed by his attorney during the course of the representation." *Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir.1982); *see also Clark v. Milam*, 847 F.Supp. 424, 426 (S.D.W.Va.1994); *Martin v. Valley Nat'l Bank* 140 F.R.D. 291, 320–21 (S.D.N.Y. 1991) ("On its face [the work product doctrine] does not give an attorney the right to withhold work product from his own client..."); *Resolution Trust Corp. v. H, P.C.*, 128 F.R.D. 647, 649 (N.D.Tex.1989); *Roberts v. Heim*, 123 F.R.D. 614, 634 (N.D.Cal.1988) ("It is difficult, if not impossible, to see how providing a client with his attorney's work product, which has been created by his attorney and for his benefit and not that of the attorney, would in any way run afoul of the public policy in favor of work-product privilege as announced by the California legislature..."); *Brown v. Car Ins. Co.*, 634 So.2d 1163, 1167 (La.1994) ("Although a lawyer may claim the work product privilege in opposition to third persons, he cannot invoke the privilege against his own client, because the client is the ultimate and primary beneficiary of the privilege."); *Maleski v. Corporate Life Ins. Co.*, 163 Pa.Cmwlth. 36, 641 A.2d 1, 5 (1994); *but see Lasky, Haas, Cohler & Munter v. Superior Court*, 172 Cal.App.3d 264, 279, 218 Cal.Rptr. 205 (1985) (stating, "[t]here are strong ethical public policy considerations for concluding that the client has an absolute right of access to all work product generated by his attorney in representing the client's interests," but holding that the attorney is the exclusive holder of the work-product privilege).

 In addition, the courts in both *Donovan* and *Remington Arms Co.* recog-

nize that the work product privilege is not absolute. *Donovan*, 90 F.R.D. at 588; *Remington Arms Co.*, 142 F.R.D. at 419. Rather, both recognize that work product may be discovered upon a showing of a substantial need for the documents and the inability to obtain their equivalent without undue hardship. *Donovan*, 90 F.R.D. at 588 (holding that the interests in attorney privacy yielded to the needs of the Secretary of Labor, as the representative of fund participants and beneficiaries, to discover material); *see also Remington Arms Co.*, 142 F.R.D. at 419 ("The Third Circuit also allows the discovery of opinion work product on a showing of good cause in rare situations, although this standard is evidently more difficult to meet than that for factual work product."), *citing In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir.1979) (finding that the government demonstrated "good cause" to overcome the protection of the work-product doctrine).

▆▆▆▆ In light of the circumstances and facts of this case, I choose to follow those courts recognizing that "the work product doctrine pertains to materials... sought by an adversary of the attorney's client." *Spivey*, 683 F.2d at 885; *see also Foster*, 188 F.3d at 1272 (stating that individual debtor's concern about incrimination "does not entitle an attorney to withhold from a client's trustee in bankruptcy work-product prepared for the client's pre-petition lawsuits, so long as the trustee and the client are not adverse in those suits"). There is a distinction between situations where the attorney's assertion of the work product privilege benefits the client, and situations like the instant proceeding where assertion of the privilege acts to the client's detriment. To allow Defendants to

invoke the privilege would inhibit AMC's chances of maximizing recovery of its portion of the Managed Claims and contravene the bankruptcy goal of maximizing Debtor's estate for the benefit of all creditors. It would also contravene the privilege's purpose of promoting the adversarial system and preventing Defendants' work product from being used *against* their clients. *See Westinghouse*, 951 F.2d at 1428. Therefore, I find that turnover is not precluded by the work product privilege.[11]

Having found that neither the attorney-client or work product privileges preclude turnover, I also find that Defendants must turn over the Attorney Files to AMC as debtor-in-possession. The only issue that remains is whether Defendants have valid liens on the Attorney Files constituting secured claims in Debtor's bankruptcy. *See, e.g., Olmsted*, 127 B.R. at 811 ("courts do seem to be unanimous in concluding that section 542(e) does not void the retaining lien..."); *In re Matassini*, 90 B.R. at 509. If so, under the terms of the Agreement, CAC will have to pay to obtain the Attorney Files. If not, Defendants must turnover the Attorney Files to Plaintiffs without compensation.

## IV. Validity of Defendants' Liens on the Attorney Files

Defendants argue that they have valid, perfected and enforceable liens on the Attorney Files under the laws of Louisiana, Illinois and Delaware. (Duane Morris' Resp. at 12–19; Breazeale (Doc. #23); Phelps Dunbar Mem. (Doc #24) at 2.) Defendants contend that their liens on the Attorney Files survived the transfer of AMC's assets to CAC because they were not provided with notice prior to the trans-

---

**11.** CAC has equal rights to assert and/or waive AMC's work product privilege for the same reasons CAC has the right to assert

and/or waive AMC's attorney-client privilege. *See* discussion, *supra* note 10.

fer. (Duane Morris' Resp. at 18–19; Phelps Dunbar Mem. (Doc # 24) at 2.) As a result, Defendants argue that they have secured claims in Debtor's bankruptcy which, under the terms of the Agreement, must be satisfied by CAC prior to turnover. (Duane Morris' Resp. at 18–19; Phelps Dunbar Mem. (Doc # 24) at 2.)

Plaintiffs dispute Defendants' contentions that they have valid liens under applicable state law. Although Plaintiffs agree that Louisiana law governs the issue with regard to Eddington [12], Phelps Dunbar and Breazeale, Plaintiffs argue that Louisiana does not recognize attorneys' liens in client papers. In addition, while Plaintiffs do not dispute that Illinois and Delaware recognize an attorneys' lien in client papers, they argue that California law governs the issue with regard to Duane Morris.[13] I will address each dispute separately.

## A. Defendants Phelps Dunbar, Eddington, and Breazeale

 Louisiana Rule of Professional Conduct 1.16(d) provides that, upon termination, a lawyer must do that which is reasonably practicable to protect his client's interest. La. State Bar Art. 16, R. Prof. Conduct, Rule 1.16(d). This includes "surrendering papers and property to which the client is entitled." *Id.* The Rule also provides that "[t]he lawyer may retain papers relating to the client to the extent permitted by other law." *Id.* Plaintiffs argue that Defendants have no lien on the Attorney Files because no other law in Louisiana recognizes an attorney's retaining lien in client files and papers. (Pls.' Mem. (Doc. # 10) at 7.) Defendants disagree.

To support their contention that the Louisiana Civil Code provides for an attorney to assert a retaining lien in his work product, Defendants cite to Louisiana Civil Code Article 3227. (Breazeale Mem. (Doc. # 23) at 2.) [14] Article 3227 provides:

> [h]e who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.

La. Civ. Code Ann. art. 3227. Defendants argue that this language provides lawyers with a Civil Code vendor's lien on their work product under Louisiana law. I disagree.

Article 3227 speaks only with respect to a vendor's preference in property that he sold to a debtor over the liens of the debtor's other creditors. Article 3227 says nothing with regard to a vendor's rights in such property vis-a-vis the debtor. In the instant case, there are no other creditors claiming a lien on the Attorney Files possessed by each Defendant. The dispute does not concern Defendants' preference in the Attorney Files over Debtor's other creditors, it concerns only Defendants' rights in the Attorney Files with respect to

---

**12.** Although Defendants state that Delaware and Louisiana law govern Eddington's alleged lien (Duane Morris' Resp. (Doc. # 25) at 11–12), their discussion of Eddington's lien focuses solely on the applicability of Louisiana law (*id.* at 16–18). Plaintiffs agree that Louisiana law governs Eddington's lien. In addition, for the reasons discussed in Part IV.B. of this opinion, I find Delaware law inapplicable. *See* discussion *infra* Part IV.B.

**13.** *See* discussion, *supra* Part I.

**14.** The arguments made by Breazeale and Phelps Dunbar in opposition Plaintiffs' motion have been adopted by each other, but not by Duane Morris or Eddington.

Debtor itself. Therefore, I find Article 3227 inapplicable.

Similarly, I am not persuaded by Defendants' arguments that both the Louisiana Supreme Court and the Court of Appeal for Louisiana have recognized an attorney's common law right to retain client papers in his possession. (Duane Morris' Resp. (Doc. # 25) at 16–17.) Neither case cited by Defendants addresses the issue of whether a lawyer may assert a retaining lien in his client's papers and files. *See Butchers' Union Slaughter–House & Live–Stock Landing Co. v. Crescent City Live–Stock Landing & Slaughter–House Co.*, 6 So. 508, 510–12 (La.1889) (holding that attorney had right to a retaining lien in client funds recovered in one lawsuit for fees and expenses owed for other cases in which he had represented plaintiff); *Bd. of Trustees of E. Baton Rouge Mortgage Fin. Auth. v. All Taxpayers*, 361 So.2d 292, 296 (La.Ct.App.1978) (holding defendant, as judgment creditor of plaintiff, could not garnish plaintiff's funds in attorneys' possession where attorneys were entitled to such funds against plaintiff for unpaid legal services). The language cited by the courts recognizing that the common law solicitor's retaining lien attached to all client's documents in an attorney's possession appears to be dicta. *See Butchers' Union*, 6 So. at 511 ("We quote from Ewell Evans, Ag., as follows: . . . [t]he retaining lien of a solicitor attaches to all deeds, papers, money and chattels in his possession, belonging to his client, and which have come into his hands in the course of and with reference to his professional em-

ployment. . ."); *Bd. of Trustees*, 361 So.2d at 295 ("Under the common law, there are two kinds of attorneys' liens: (1) a charging lien. . . and (2) a retaining lien, the right to retain possession of a client's documents, money, etc., until paid for his professional services.")

While both courts expressly recognized the attorneys' retaining lien in clients funds,[15] neither recognized or even addressed the issue of whether Louisiana provides for attorneys' retaining liens in clients' files and papers. *See Butchers' Union*, 6 So. at 510; *Bd. of Trustees*, 361 So.2d at 296. Although Defendants argue that there is no basis for distinguishing between the two types of retaining liens, I disagree.

Louisiana case law should not be extended to recognize an attorneys' lien in client papers where one is not otherwise expressly provided for. *See e.g., American–La France & Foamite Indus. v. Town of Winnfield*, 184 La. 1043, 168 So. 293, 295 (1936) (denying claim of vendor's lien and privilege on fire apparatus sold to town and stating, "[p]rivileges cannot be extended by implication or analogy; they are never allowed but when expressly granted by law. . ."); *Smith v. Vicksburg S. & P. Ry. Co.*, 112 La. 985, 36 So. 826, 828 (1904) ("In this state the [charging] lien is regulated by statute. We do not think we should extend the scope and effect of the statute in order to recognize a lien not embraced in its terms"). The language contained in the cases and statutes cited by Defendants should not be liberally con-

---

**15.** The retaining lien for attorneys' fees in Louisiana was established by the Louisiana Supreme Court's interpretation of Article 3022 and 3023 of the Louisiana Civil Code in *Butchers' Union. Bd. of Trustees*, 361 So.2d at 295. Article 3022 provides that a principal ought to reimburse an [attorney] and, absent fault upon the part of the agent, cannot refuse to pay. La. Civ. Code Ann. art. 3022. Article 3023 expressly provides that the [attorney] may retain fees and expenses *"out of* the property of the principal in his hands." La. Civ. Code Ann. art. 3023 *(emphasis added)*. The inclusion of the words "out of" suggest that Louisiana only recognizes an attorney's retaining lien in client funds because fees and expenses can only be retained "out of" money, not papers and files.

strued to create new law when the effect of such a construction would be to give Defendants a preferred position in Debtor's bankruptcy. To hold that Louisiana recognizes an attorneys' retaining lien in client's papers and files would, in effect, place Defendants in positions of secured creditors ahead of Debtor's general unsecured creditors. Absent unequivocal Louisiana statutory or case law authority recognizing an attorneys' retaining lien in a client's papers and files, I conclude that no such lien exists in the instant situation.

### B. Defendant Duane Morris

The parties disagree as to which state's law governs the determination of whether Duane Morris has a valid lien on the Attorney Files. Plaintiffs argue that California law governs the determination. Defendants argue that Delaware and/or Illinois law apply. The first step in a choice-of-law analysis is to determine whether a true conflict exists between applicable state laws. *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997). The parties do not dispute that Duane Morris would have a valid, enforceable lien under the laws of Illinois or Delaware, but would not have a valid, enforceable lien under California law. Because the outcome of the parties' dispute differs depending on which state's law governs the

determination, the Court must apply the Restatement (Second) of Conflict of Laws' "most significant relationship" test to determine which state law applies.[16] *See* Del. R. Prof. Conduct 8.5, Comment ("If the rules of professional conduct in the two jurisdictions differ, principles of conflict of laws may apply... Where [a] lawyer is licensed to practice law in two jurisdictions which impose conflicting obligations, applicable rules of choice of law may govern the situation.")

Under § 188 of the Restatement, "[i]n the absence of an effective choice of law by the parties," the factors to be considered in determining which state's law governs a particular issue include: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and(e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) Conflict of Laws § 188; *see, e.g., E.I. du Pont de Nemours*, 1991 WL 236943, at *2, 1991 Del.Super. LEXIS 416, at *5. These factors are to be evaluated according to their relative importance with respect to the issue involved and in consideration of the conflict of law principles listed in § 6 of the Restatement[17]. Restatement (Second)

---

**16.** "There is substantial disagreement among the courts as to whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the state in which it sits or the federal common law choice-of-law rules." *T. Frederick Jackson, Inc. v. Pepper, Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.)*, 2000 WL 376398, at *11 (D.Del. Mar.28, 2000). However, in the instant action it is does not matter which choice-of-law rule the Court applies because both Delaware and the federal common law apply the Restatement's "most significant relationship test" to decide choice of law issues. *See, e.g., Schering Corp. v. Zeneca Inc.*, 958 F.Supp. 196, 202 (D.Del.1996); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1991

WL 236943, at *1, 1991 Del.Super. LEXIS 416, at *4 (Del.Super.Oct. 22, 1991); *In re Vortex Fishing Sys., Inc.*, 262 F.3d 985, 994 (9th Cir.2001) ("Federal choice of law rules follow the approach of the Restatement (Second) of Conflict of Laws."); *Velasquez v. Crown Life Ins. Co.*, 1999 WL 33305652, at *4 (S.D.Tex. Aug.10, 1999) ("Both Texas and federal choice of law principles look to the Restatement (Second) of Conflicts of Laws for deciding choice of law questions.")

**17.** Section 6 of the Restatement provides, in pertinent part:

 * * * * * *

 (2) ... the factors relevant to the choice of the applicable rule of law include:

Conflict of Laws § 188, Comment b at 576; *see, e.g., E.I. du Pont de Nemours*, 1991 WL 236943, at *2, 1991 Del.Super. LEXIS 416, at *5, 8*. Ordinarily, where the place of contracting and performance are the same, the law of that state will control. Restatement (Second) Conflict of Laws § 188(3); *see also Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 1996 WL 527349, at *4 (Del.Super.Ct.1996). However, where the policies set forth in § 6 of the Restatement require otherwise, these factors will not be controlling. Restatement (Second) Conflict of Laws § 188(3); *see also Esmark*, 1996 WL 527349, at *4.

 Applying this analysis to the facts before me, I find that Louisiana and California have the most significant relationship with AMC, Duane Morris (collectively, the "Parties" ') and their contractual relationship. Therefore, Louisiana and/or California law govern the determination of whether Duane Morris has a valid lien on the Attorney Files.

Contrary to Defendants' assertion, Delaware is not a relevant jurisdiction. (Duane Morris' Resp. (Doc. # 25) at 11–14.) The fact that the instant adversary proceeding is currently pending in Delaware has no bearing on the issue of whether Duane Morris has a valid lien on the Attorney Files. Delaware has no relationship to the Parties or their contractual relationship other than the fact that AMC is incorporated and has filed for bankruptcy in Delaware. More significant than the Parties contact with Delaware is their contact with Louisiana, the place where AMC has its principal place of business and one of the states where performance of the contract

took place. *See* Restatement (Second) of Conflict of Laws § 188, Comment e ("At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation").

In addition, I am not persuaded by Defendants argument that Illinois law applies. The fact that Duane Morris has an office in Illinois and that the Parties happened to negotiate and execute the engagement letter securing Duane Morris' services in that office is insignificant. Duane Morris has nineteen offices nationwide, including an office in California, one of the places where the contract was performed. Although the first two factors listed in § 188(2) are Illinois contacts, I find these contacts to be merely fortuitous. *See, e.g., Esmark*, 1996 WL 527349 at *4; *E.I. du Pont de Nemours*, 1991 WL 236943 at *2, 1991 Del.Super. LEXIS 416 at *14; Restatement (Second) Conflict of Laws § 188, Comment e at 579–80 ("the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract.")

The fact that the case files are currently located in Illinois is also insignificant. Duane Morris' representation of AMC has terminated and therefore, it is irrelevant where the Attorney Files are currently located. Furthermore, the Attorney Files do not constitute the subject matter of the contract. As a contract for legal services, all that could possibly be characterized as the subject matter of the Parties' contract are the services Duane Morris provided on

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

behalf of AMC in connection to the AMC–Cisco Litigation. These services were performed in California and Louisiana. Although Duane Morris argues that Illinois was also a place of performance, I disagree.[18] In my view, for the purposes of a choice-of-law analysis, where a client retains an attorney in connection with an action or proceeding, the place of performance is the jurisdiction in which the action or proceeding takes place.

In my opinion, the place of performance is the most substantial factor to be considered in determining which state's law governs the determination of whether Duane Morris has a valid lien on the Attorney Files. Both the unpaid fees and expenses that Duane Morris claims gave rise to its lien, and the Attorney Files to which Duane Morris contends it lien attaches were generated and/or entrusted to Duane Morris in connection to the litigation pending in California and Louisiana. It is appropriate, therefore, that California and/or Louisiana law be applied. *See Esmark*, 1996 WL 527349 at *4–5 (applying Delaware law in an action for indemnification under a hold harmless agreement where the agreement was negotiated, signed and would be performed in Illinois, but where the risk-producing activity causing the need for indemnification arose in Delaware and where the plaintiff sought "indemnification for attorneys' fees and expenses that were, for the most part, generated in litigation in Delaware.") Other courts have found that the law of the place in which performance of a contract between the attorney and client was intended or anticipated governs the existence and effect of an attorney's lien arising out of that contract. *See, e.g., Peresipka v. Elgin, J. & E. Ry. Co.*, 231 F.2d 268, 271 (7th Cir. 1956) (Finding that Illinois governed the

existence of an attorney's lien where "irrespective of whether the contract was signed in Indiana or Illinois, the record unmistakably discloses that it was to be performed in the latter state."); *Great Lakes Transit Corp. v. Marceau*, 154 F.2d 623, 624, 625 (2d Cir.1946) (Finding New York law governed attorneys' lien where contract was signed in Illinois, but "[t]he Court below found that the parties to the ... retainer intended that any action on the claim should be brought in New York."); *Lehigh & N.E.R. Co. v. Finnerty*, 61 F.2d 289, 290 (3d Cir.1932) ("[t]he employment of an attorney of New Jersey and the bringing of suit in New Jersey indicate that the parties intended from the first that suit should be brought in that state. And being brought there, the laws of that state control as to the lien."); *Sea Catch*, 36 B.R. at 229–30 ("The law of the place in which the contract between the attorney and client is to be performed or the site of the fund has been said to govern the existence and effect of an attorney's lien.")

Finding that California and/or Louisiana law govern the determination of Duane Morris' lien on the Attorney Files protects both the Parties' justified expectations and the values of certainty, predictability and uniformity of result. Restatement (Second) Conflict of Laws § 188, Comment b ("the protection of the justified expectations of the parties is of considerable importance in contracts... [t]he need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result.") Duane Morris was retained to represent AMC in connection with the AMC–Cisco Litigation. At the time the engagement letter was signed, the AMC–Cisco Litigation was already pending in

---

**18.** In its Response (Doc. # 25), Duane Morris argues that "the place of performance was

Illinois, Louisiana and California." (*Id.* at 15.)

Louisiana and California. The sequence of events evinces the Parties intent and/or anticipation that Duane Morris' services would primarily be performed in California and Louisiana. As such, the Parties should have expected that Louisiana and/or California law would govern the issues arising out of their contractual relationship and its performance.

I disagree with Duane Morris' contention that AMC had a reasonable expectation that the professional standards of Illinois would govern the representation merely because AMC signed the contract in Illinois with Illinois attorneys. I find it more likely that AMC would expect the professional standards of California and/or Louisiana to govern because those are the places where performance of the contract was intended, anticipated and actually took place. AMC would be particularly likely to expect Louisiana law to govern because AMC has its principal place of business in New Orleans.

In addition, Duane Morris cannot argue that it had a justified expectation that only Illinois law would control. As members of the legal profession, Duane Morris attorneys know, or should know, that they become subject to the professional rules of conduct in each state in which they appear on behalf of a client. Two Illinois attorneys appeared on behalf of AMC in California, were admitted pro hac vice for that purpose, and therefore, agreed to abide by California's Rules of Professional Conduct. One of the attorneys representing AMC is a member of the California Bar. Cisco's action against AMC was transferred to Louisiana upon motion submitted by these attorneys. At the same time, AMC's action against Cisco was pending in Louisiana. Therefore, Duane Morris should have reasonably expected that Louisiana and California might govern the determi-

nation of whether it has a valid lien on the Attorney Files.

Furthermore, California and Louisiana have a greater interest in having their laws applied to the determination of Duane Morris' lien than Delaware or Illinois. As previously discussed, Delaware has little or no relationship to AMC's action against Cisco, the Parties or their contract. Although Illinois may have an interest in protecting the expectations of their attorneys in getting paid, Louisiana and California have a greater interest in regulating the conduct of attorneys appearing before their courts to ensure that the attorneys' clients are properly represented and that the attorneys act in the clients' best interests. California has a particular interest because one of the attorneys in question is a member of the California Bar. Louisiana has an additional interest in protecting its residents' rights to litigate any claims they may have against others. This interest becomes particularly significant where those residents are debtor's in bankruptcy and their estates could benefit from recoveries that may not be obtainable without the use of information in the Attorney Files. Furthermore, any interest of Illinois in protecting resident attorneys is offset by Duane Morris' knowledge that it would be performing services for AMC in California and Louisiana and thereby become subject to the professional standards of those jurisdictions.

In light of the facts and the considerations discussed above, I find that California and/or Louisiana law govern the determination of whether Duane Morris has a valid, perfected lien on the Attorney Files. Because there is no conflict between the laws of Louisiana and California on the issue of whether an attorney may retain a lien in clients' files and papers, the Court need not engage in a choice-of-law analysis as between those two states. *Williams,*

109 F.3d at 893; *see* discussion, *supra* Part IV–A; *see also Acad. of California Optometrists, Inc. v. Superior Court,* 51 Cal. App.3d 999, 1006, 124 Cal.Rptr. 668 (Cal. Ct.App.1975) (holding, "where the subject matter of an attorney's retaining lien is of no economic value to him, but is used only to extort disputed fees from his client, the lien is void"); Kallen v. Delug, 157 Cal. App.3d 940, 950, 203 Cal.Rptr. 879 (Cal.Ct. App.1984) (stating that it is a breach of the attorney's fiduciary duty "to retain a client's case files after discharge [of the attorney], in that an attorney's work product belongs absolutely to the client whether or not the attorney has been paid for his services" (citations omitted)). I find that Duane Morris does not have a valid lien on the Attorney Files under California or Louisiana law.

### CONCLUSION

For the reasons stated above, Defendants are required to turn over the Attorney Files, whether given to Defendants by AMC or prepared for AMC by Defendants in the course performing professional services for AMC. Adequate protection is not required because none of the Defendants hold valid, perfected and enforceable liens in these documents under applicable state law.